NEW YORK COUNTY.—HON. R. S. RANSOM, SURROGATE.—February, 1888.

MATTER OF WHITE.

*In the matter of the estate of* JOHN H. WHITE, *deceased.*

Where an executor or administrator, who has paid out money on account of expenses of administration, produces a voucher showing the nature of the disbursement and stating facts which, if true, show the same to have been reasonable, and necessary for the good of the estate, a presumption is raised in favor of the correctness of the charge, which

must be opposed by affirmative evidence on the part of one contesting the demand for credit.

Valentine v. Valentine, 3 *Dem.*, 597—approved.

An executor or administrator has authority, where the circumstances of the estate render such a course reasonable, to employ an agent in the management of its affairs; and such agent may be also the legal adviser of the representative.

McWhorter v. Benson, *Hopk. Ch. R.*, 28—followed.

A decree, judicially settling an executor's or administrator's account which includes a bill for expenses of administration, shown to have been only partly paid, protects the accounting party as to that part, only, of the bill so paid, and leaves the question of the propriety of further payments on account thereof open for future settlement.

HEARING of exceptions taken by executrix to report of referee, to whom were referred her account, and creditors' objections thereto, filed in proceedings for judicial settlement.

ELIAL F. HALL, *for executrix.*

PAYSON MERRILL, *of counsel:*

The final account of Lucy E. White, sole executrix of decedent's will was filed May 5th, 1886. The exceptions of the executrix cover the sum of $863.44, which was the amount disallowed by the referee from the sums paid by the executrix to Hall & McMahon and to Elial F. Hall individually, for services as attorney, counsel and agent.

Decedent died February 26th, 1877. His will was proved March 21st, 1877. He gave everything to his wife and made her sole executrix. She engaged Elial F. Hall as her attorney on May 11th. On June 26th, 1877, she gave up her residence in New York city, and returned to her former home in Jamestown,

N. Y., where she has since resided, though occasionally coming to the city.

The executrix filed her first account on August 19th, 1879, which went to a decree November 13th, 1879, without objections. The last item in Schedule C of this old account, and numbered as Voucher 141, was as follows: "Amount of payments made to Hall & McMahon on account for professional services rendered from May 11, 1877, to this date, $2,096.03." Then came the signature of the executrix to the schedule, and immediately below this on the same page was the following memorandum or notice: "The above payments of $2,096.03 to Hall & McMahon were made on account of their bill of $3,137.74, which bill is filed with this account." See Voucher 141. The balance left unpaid of this bill was $1,041.71. It was all paid as early as June, 1880. It stands as an item of credit under Voucher 137 of Schedule C of the present account. In June, 1886, six years after its payment, objection to it was filed by E. L. Bushe, Esq. (law partner of the testator), as attorney for the same creditors for whom he had appeared on the accounting in 1879, as appears by the decree. The trial of this objection to the payment of the balance of $1,041.71, involved a trial of the entire bill of $3,137.74, which is divided into 63 items as numbered. Sixteen of these have been carefully picked out and adjudged to be vulnerable, and cut down to the extent of $538.22, which is the sum deducted by the referee from the balance of $1,041,71. Sixteen of the 20 exceptions filed by the executrix relate to these 16 rulings. The referee held that the

decree of November 13, 1878, was a protection to the executrix only in respect to the $2,096.03 actually paid on account of the bill of Hall & McMahon, and that the provision of the Revised Statutes (Part 2, ch. 6, tit. 3, art. 3) making the final settlement of an account conclusive evidence, could not be applied to the bill itself or the balance unpaid.   We submit that the referee erred in so deciding.   But further than this, he treated the bill as if it were a matter of yesterday, and allowed no presumptions in favor of the executrix or her attorneys to be drawn from the following facts: (1) That the bill was filed as a voucher with the account in 1879, (2) that attention was especially called to it by the executrix in that account, (3) that no objection was then made to it by anybody, (4) that it was paid as a matter of course in honest reliance upon the fact as supposed that Mr. Bushe and his clients were satisfied with it, as was probably the fact at that time, (5) that six or seven years had passed without any hint from them of dissatisfaction, and (6) that there is no allegation or pretence that any item of this bill wears any badge of fraud or contains any element of " gross injustice," like the charge of $5,000, in St. John v. McKee (2 *Dem.*, 236), cited by the referee.

The entire amount of assets in cash received and accounted for by the executrix is $103,213.22.

The amount of the principal aside from interest of the claims of creditors cited on this accounting and entitled to share in its proceeds is $29,248.18.   On these claims the executrix has paid the sum of $18,893.95, which is over sixty-four and one half per

cent. of the principal. (There has been no expense for a bookkeeper to keep the accounts with these creditors.)

Most of the estate consisted of real estate, of which there were 17 separate pieces or parcels, three of which were abandoned. The amount of taxes and assessments on the remaining 14 pieces that were confirmed before the decease of the testator, and had to be paid in full by the executrix, was more than $14,000.

The amount of the bill of Hall & McMahon filed with the account in 1879, and of Hall's three bills filed with the present account is $6,331.85, from which deduct $78.66 for disbursements, and you have the sum of $6,253.19 as the entire amount of the charges for services, to which there may be added the allowance of $1,000 in the decree on the accounting in 1879.

The amount of cash in the hands of the executrix as stated in the present account and supplement, together with interest earned in the Trust Co., is $15,972.02, to which the referee adds as disallowed by him from the expense account the sum of $760.63, making in all the sum of $16,732.65. From this last sum, or rather, if we are right in our contention, from the sum of $15,972.02, there is to be deducted the sum of $1,153.75 for the fees of the referee and stenographer, thus leaving a balance of $15.578.90, or rather, if we are right in our contention, the sum of $14,818.27.

In the case of White v. Kane (19 *J. & S.*, 295), it was decided that Mrs. White, as devisee after payment

of debts, was a trustee for creditors, and as such had full power to sell and convey the real estate.

## The Burden of Proof.

The referee states the rule of law which governs him as follows: "It is well settled that an executor is not entitled to reimbursement for sums expended for legal services by simply showing the fact of payment, even though he also shows that he has acted honestly and in good faith.  Upon objection being made, he must show the necessity and value of such services." Our answer to this is that this rule applies only where there are no vouchers or the vouchers are insufficient, or where they are such (as was the fact in the cases cited by the referee) that there is some grave suspicion about them.  But here no question was raised as to the sufficiency of the vouchers.  Consequently the burden of proof was on the objectors.

The rule as it stood in the first edition of the Revised Statutes, and as it has stood ever since without alteration or amendment is as follows: "And in all cases such allowance shall be made for their actual and necessary expenses as shall appear just and reasonable."  Executors and trustees, when they file their accounts, must file vouchers for their expenses. These must be such that it will "*appear*" upon the face of them, that the expenses were necessary, just and reasonable.  If they satisfy this requirement, then the burden of proof is upon the objectors. Counsel fees stand upon the same footing as other expenses.  If the vouchers are insufficient in the par-

ticulars mentioned, then and only then the burden is upon the executor to adduce evidence to make up for what is lacking in the voucher. The *onus probandi* is always on the party having the liberty to surcharge and falsify (Smith's Manual of Equity, 245 ; Hoffman's Master in Chancery, 81 ; Metzger v. Metzger, 1 *Bradf.*, 265 ; Boughton v. Flint, 74 *N. Y.*, 485 ; Fowler v. Lockwood, 3 *Redf.*, 465 ; Valentine v. Valentine, 3 *Dem.*, 602).

In the first two of the three cases cited by the referee from 2 *Demarest*, the charges for counsel fees, in the language of Surrogate Calvin (4 *Redf.*, 6) "appeared to be exorbitant." In fact, they were so excessive that it might well be said of the vouchers that they were fraudulent on their face, and they were evidently so regarded by Surrogate Rollins. In St. John v. McKee (2 *Dem.*, 216), the voucher for $5,000 "describes in very broad and sweeping terms the services for which the charge is made, and its lack of particularity has not been supplied by the testimony before the referee. Neither the executor nor his counsel, both of whom were examined at the reference, seemed to have any accurate notion of the nature and extent of such services." In Journault v. Ferris (2 *Dem.*, 320), there were three items, aggregating $7,800, for counsel fees. One of these, for $2,500, as described by the Surrogate on page 325, covered among other things, services in receiving funds, examining mortgages and their value, taking care of them, collecting interest, keeping the accounts, etc. It does not appear that there was any proceeding in court of any kind. Under these circumstances,

the referee obviously erred in casting the burden of proof upon the objectors. The third case cited by the referee is Wilson v. Wilson (2 *Dem.*, 462). In this, the facts are so meagrely stated that it is impossible to see its bearing in this connection.

The rule as quoted from the referee's opinion, is taken by him from the opinion of the Surrogate in St. John v. McKee (2 *Dem.*, 236). The referee ignores the fact in this case, as also in Journault v. Ferris (2 *Dem.*, 320), of the suspicious and fraudulent character of the vouchers. He takes the law of cases where the vouchers were bad, and applies it to a case where they are confessedly good. This, we submit, is a fatal error. But it is sufficient to account for all the rulings excepted to by the executrix. According to the view of the referee, the executrix stood before him as if she were plaintiff in an action at law for money paid, laid out and expended. An objection to any of the items of payments for services raised an issue of fact, the same as a general denial, and the burden of proof was on the executrix to " show the necessity and value of such services," and the benefit of any and every doubt was to be given to the objectors. Thus as to each item objected to, the referee sat as a jury upon the trial of a *quantum meruit*, and gave his independent verdict *de novo*, as to value, without any consideration for the fact that he was dealing with the accounts of an executrix and trustee, and whose vouchers were all right. " It is thought to be well settled that a trustee, while acting under a general trust, is entitled to be allowed for all disbursements for taxes, repairs, salaries, insurances, and for

all other charges and expenses which he in good faith thinks proper to pay" (Young v. Brush, 28 *N. Y.*, 672). As to the items in the bill of Hall & McMahon, some allowance ought to have been made for the length of time that had elapsed and the difficulty of going into the details of business, that had been wound up and disposed of for eight or nine years and long since forgotten. In Young v. Brush (*supra*), great consideration was given, to the advantage of the executor, to what Judge DAVIES spoke of as "this great lapse of time."

We have not overlooked the statement in 2 *Dem.*, 238, and again in 4 *Dem.*, 334, that the authority of the Surrogate to sanction credits for sums expended for counsel fees is derived from L. 1863, ch., 362. This statement we beg leave to say, is disproved by the facts of history. The statute of 1863 made no change in the law on the point now before us. It altered the rates of commissions and then repeated *verbatim et literatim* the original provision of the Revised Statutes as we have quoted it. And this provision itself was only a codification of the rule of practice long observed in ecclesiastical and equity, and also in Surrogates' courts.

We have also observed the distinction sought to be made between credits for expenses and those for payments of debts. See 2 *Dem.*, 324–325. This distinction is *obiter*. It is founded upon the change just mentioned, made, as supposed, by the statute of 1863, and it falls to the ground upon the discovery of the fact that that statute made no such change.

*Charges disallowed on the ground that the services should have been performed by the executrix.*

The leading case on this subject is McWhorter v. Benson (*Hopk. Ch. R.*, 28), of which the head note is as follows: " An executor is entitled in the settlement of his accounts to be allowed the reasonable charges paid by him to an agent employed in the management of the estate of which he is executor, if the circumstances of the estate rendered the employment of such agent proper and justifiable."

The testator in this case was John Lawrence, of New York city, and the defendant Egbert Benson was the sole acting executor. The agent in the case was a lawyer named Boyd. His bill was paid by Benson and allowed by the Master, and afterwards by the Chancellor. The reporter makes no accurate statement of the charge made by Boyd; but it appears from Schedule G, annexed to the Master's Report on file in the county clerk's office, that the charge consisted of only a single item, in words and figures as follows:

" 1815, April 1. To amount of compensation for services as general agent of the executors from October 1st, 1813, to April 1, 1815, in conducting the affairs of the estate generally, and for selling different parcels of the real estate situate in the city of New York, being a commission of $2\frac{1}{2}$ per cent. on the monies received, and $2\frac{1}{2}$ per cent. on the monies paid by him, $2,318.34.

The Chancellor, on page 34 of McWhorter v. Benson, speaks of the Lawrence estate as " this great

estate." But it was no greater than this White estate. From the schedules annexed to the Master's Report, it appears that the personal estate amounted to $22,291.64. The sum realized from the inventoried assets in the first account filed in the White estate was $26,876. The amount received and paid by Boyd, and upon which he was allowed 5 per cent. commission, must have been about $43,367. This is less than one half of the amount received and paid by the agent in this White estate, and much less than the amount collected by him on sales of real estate in this city.

We come next to the cases of Vanderheyden v. Vanderheyden (2 *Paige*, 287), and Cairns v. Chaubert (9 *Paige*, 160). In this last case the Chancellor says that the Surrogate was right in allowing the executrix the $500 paid to Clark for his services in settling the estate. The case arose out of the estate of George Rapelje, of this city. But the report in Paige gives no information as to the nature of the services for which the widow and executrix paid the $500. We have found in the records of the Surrogate's office the manuscript opinion of Surrogate CAMPBELL in this case (*filed in* 1844, *Bundle* 20), and the fact that it has never been reported or printed is our excuse for producing here the following extract :

" The third item in controversy for which the executrix claims credit is the sum of $1,000 paid to Gerardus Clark, Esq., for acting as the *Agent and Counsel* of the executrix. This item is objected to on the ground that the executrix is allowed a commission for her services, and that if she employs an agent to

do the duty imposed on her by law, she must pay him out of such commission, and not subject the estate to the double charge. It appears by the testimony of G. Clark in the case, that of the sum of $1,000 which he received, he considered that $500 only were for services rendered the personal estate of Mr. Rapelje, and that that sum only should be charged against it. It has frequently been decided that executors and administrators may employ agents when the circumstances of the case render it proper, and that all reasonable disbursements to an agent employed in good faith, for purposes beneficial and important to the estate, must be allowed (*Hopkins*, 42; 2 *Paige*, 287.)

"The present case, I think, comes fully under the above rule. Here was a large personal estate, and debts to a large amount existing against it: all of which were in great confusion, as the testator had left no books of account or instructions to guide his executrix, and to increase the difficulties, part of the property lay in Westchester county and part in the city of New York. Under all these difficulties I consider that the executrix, in order to protect the estate from imposition, was justified in employing an agent to assist her in investigating all these intricate and difficult matters. The sum of $500 charged by Mr. Clark being inconsiderable when compared with the amount of the personal estate, I am of opinion that the item is not too large, and should be allowed the executrix as a proper disbursement."

In O'Gara v. Clearkin (58 *N. Y.*, 663), the head note is as follows: "An executor or administrator may employ an agent if the peculiar circumstances of the

estate require it, and may be allowed all proper expenses for its care and management; but the compensation of the agent must be measured by the nature, extent and value of the services."

The rule is stated in 3 W'ms on Ex'rs, 1971, as follows: "An executor is justified in having recourse to an agent to collect the assets in cases where a provident owner might well employ a collector, and the executor will therefore be allowed the expense so incurred in his accounts."

Again, a devise as here, charged with the payment of debts, is a devise in trust to pay the debts. This was decided in White v. Kane (19 *J. & S.*, 295). The attitude of Mrs. White therefore is like that of an assignee for the benefit of creditors, "with the customary authority to employ other persons to act for him when circumstances may render it necessary, and when for good and sufficient reasons he is unable to give the business his personal supervision and attention" (Casey v. Janes, 37 *N. Y.*, 612).

Again, the Chancellor, on page 34 of McWhorter v. Benson, speaks of the "incumbered and perplexed situation" of the Lawrence estate as the reason that rendered it fit and necessary to employ an agent. It requires no argument to show that this reasoning applies *a fortiori* to an insolvent estate.

One of the evils to be guarded against in the settlement of estates is the evil of saddling good assets with the expenses of collecting bad ones. This evil will be avoided if you put the bad assets one side, and make them stand on their own footing, and keep a separate and distinct account of them. This is just what has

been done here, with a result, however, to the estate that is inconsiderable. But there is no reason in this circumstance or in any other, why the attorney should not receive such a reward from the fruits of his industry as his services are "inherently worth."

E. L. BUSHE, *for W. N. Harvey, guardian, and others creditors.*

W. A. W. STEWART, *for U. S. Trust Co., creditor.*

J. WHITE, *and* WEHLE & JORDAN, *for creditors.*

THE SURROGATE.—The rule is well settled that, where a payment is made by the executor for expense of administration and a voucher for the same is produced, showing upon its face the nature and character of the expenditure and a reasonable statement of the facts rendering the same just and reasonable, a *prima facie* case for the executor is made out and the burden of impeaching such expenditure is on the objector. If the charge be reasonable on its face and said to be necessarily contracted for the good and benefit of the estate, the presumption is that it is correct and the burden is on the objectors (Matter of Frazer, 92 *N. Y.*, 247; Hoffm. Mast. Ch., 81; Metzger v. Metzger, 1 *Bradf.*, 267; Fowler v. Lockwood, 3 *Redf.*, 468; Valentine v. Valentine, 3 *Dem.*, 597.)

These cases establish the justness and reasonableness of all the executor's charges and sustain all the exceptions to the referee's report, unless the objectors have impeached them by testimony sustaining their objections. It is, therefore, important to look at the testimony to ascertain whether the objectors have overcome the *prima facie* case of the executrix. No

witnesses were called by the objectors to impeach any of the charges of the executrix, but they relied on certain adjudicated cases which seemed to them to cast the burden of showing the propriety of the charges upon her, notwithstanding the fact that by vouchers she had shown, within the doctrine of these same cases, as it seems to me, that the charges were just and reasonable and must be allowed, unless overthrown by direct evidence. I cannot agree with the learned referee or counsel in this regard. A careful examination of the account of the executrix and the vouchers satisfies me that her expenses were just and reasonable and should be allowed.

Specially remarking the suggestions of the learned referee to the effect that certain items disallowed by him were for services which the executrix should have rendered herself, he is in error, I think, under well settled rules of decision on this point, which are summed up in McWhorter v. Benson (*Hopk. Ch. R.*, 28): "An executor is entitled in the settlement of his accounts to be allowed the reasonable charges paid by him to an agent employed in the management of the estate of which he is executor, if the circumstances of the estate rendered the employment of such agent proper and justifiable." The executrix, considering the circumstances of the estate, had a right to employ Mr. Hall and his firm as agents as well as attorneys, and his and its services were necessary and proper, and compensation therefor is a righteous charge against the estate. As I have already said, there is no allegation here that the amount charged is excessive for the services; and from an inspection of the ac-

count and vouchers the amounts charged are reasonable and should be allowed.

Without taking up each item of the account disallowed by the referee and discussing it in the light of his opinion, it is enough to say in disposing of them all, that no testimony was given by the objectors; and whilst the learned referee had a right to exercise his own judgment, he could not do so uninfluenced by the uncontradicted evidence given by the executor, which clearly established the propriety of the charges. I, therefore, hold that the learned referee erred in making the reductions and disallowances. It is an undoubted fact that the tendency of all persons managing estates is toward extravagance and it is the duty of the Surrogate and his referees to carefully guard against this disposition; and in this case, no doubt, the learned referee was greatly influenced by this fact and the further fact, which seems admitted here, that this estate is insolvent. Fully appreciating the force of this reason, I am satisfied that these charges were fairly made and that the affairs of the estate were wisely and economically administered.

This brings me to the last question, viz.: as to the soundness of the referee's ruling that the decree of November 13th, 1879, only protected the executrix in respect of the $2,096.03, actually paid on account of the bill of Hall & McMahon. Considering my views on the merits of the items which make up the balance unpaid on that bill presented in 1879, it is not important that I should spend any time on this subject. It is enough to say that I entirely agree with the referee (Leviness v. Cassebeer, 3 *Redf.*, 491 ; Re Withers, 2

*Civ. Pro.*, 162; Re Stokes, 3 *id.*, 384; Tucker v. Tucker, 4 *Keyes*, 136).