## *In re* ARCHER.

*(Surrogate's Court, Rockland County, Filed March 10, 1892.)*

1. EXECUTORS—ACCOUNTING—LIABILITY FOR PROFITS OF BUSINESS.

When the profits of a business carried on by the executors jointly with a third person are not accounted for during a certain period, and there is no proof that the same were received by the accounting executors, or that the same were lost to the estate by their negligence, they should not be charged therewith, especially upon the contention of a contestant who was himself an executor during the period in question, and who had special supervision over the business out of which the profits arose, but who had been subsequently removed from the executorship.

2. SAME—TRUST ESTATE—LIABILITY FOR REPAIRS AND TAXES.

Testator devised all his property to his executors upon trust to receive the income thereof during the life of his widow, and pay the same to his widow and children, and he directed that should his sons C. and G. and his wife desire to reside in his dwelling house they might do so without paying rent therefor during his wife's lifetime, each paying one-third of the living expenses of the household. *Held*, that the widow and such children did not take an estate in the dwelling house analogous to a life estate, so as to charge them with repairs and taxes, as the executors took a legal title, with the duty not only of receiving the income, but of discharging thereout all taxes, insurance and repairs, and pay over the balance in accordance with the directions of the will.

**3. SAME—SET-OFF.**

To entitle the executors to credit for the price of goods of the estate sold by them, and which the purchaser owes the estate, it should be shown to be uncollectible without their fault, or that actual credit has been given (and not merely intended to be given) in the nature of a payment or set-off on an account or claim against the estate.

**4. SAME—PROOF OF PAYMENT—VOUCHER.**

When there is no voucher for an expenditure, the burden is upon the executors to establish the credit by the uncontradicted oath of the accounting party, stating positively the fact of payment, etc. Code Civ. Pro. sec. 2734.

**5. SAME—DEBT DUE BY A CONTESTING EXECUTOR.**

Contestant will be charged with a debt due by him to the estate, when the same appears by the evidence of one of the executors to be the balance due by contestant out of wood and ·brick transactions between him and the estate, although the contestant claims that the item was the amount of a loan made by him to the executors and repaid to him, when his testimony is unsupported, and as he was himself an acting executor at the time, he could have had an entry made in the executors' books, showing that it was a loan, the actual entry being "Dif. in brick and wood account, $277.66."

**6. EXPENSES OF ADMINISTRATION—REASONABLENESS OF EXPENDITURE.**

Items of an executors' account for administration expenses, including professional services, in the absence of proof that such services were necessary for the protection or administration of the estate, and that the sum charged is reasonable in amount, should be disallowed.

**7. EXECUTORS—TRUST ESTATE—RIGHT TO RENTAL INCOME.**

Testator provided that should his son (the contestant) desire to reside where he now does (being a dwelling, part of testator's estate), he might do so without paying any rent during the testator's wife's lifetime. Contestant, after living in the dwelling for some time, removed elsewhere during the widow's life, whereupon the executors (who were directed by the will to receive the income of testator's property and apply the same as directed) let same to other tenants and received the rents thereof. *Held*, that the contestant was not entitled to such rents, as the will gave him only a right of occupancy during the widow's life, and that they belonged to the trust estate.

**8. SAME—PURCHASE BY EXECUTOR INDIVIDUALLY.**

When it appeared that the one-half interest in a barge, the other half of which was owned by the estate, was purchased for a consideration of $2,300, and the bill of sale thereof taken in the name of one

of the executors, who claimed that he purchased individually, but all the circumstances connected with the purchase and the relation of the parties, showed that the purchase was in the interest of the estate, the profits of the barge paying the purchase money, save $50 paid by the executor to whom the bill of sale was given. *Held*, that the purchase was one for the estate, and that the property thereby acquired, and the earnings thereof, should be accounted for as estate property and assets.

Judicial settlement of accounts of executors of Michael A. Archer, deceased.

Irving Brown, for executors; Alonzo Wheeler, for contestants.

WEIANT, S.—The testator's will was admitted to probate about the year 1881. Charles D. Archer and Allison M. Archer, the contestant, were appointed executors thereof, and authorized to then qualify. George A. Archer was named also as an executor, but not to qualify until he arrived at 21 years of age. Charles and Allison qualified at once, and entered upon their duties. George qualified in about the year 1883, on his arrival at 21 years of age. In a proceeding commenced in January, 1888, Allison was enjoined from acting further as executor, and removed as such later in said year by a decree in such proceeding. Since the commencement of that proceeding the accounting executors have continued to act in the administration of the estate. This proceeding is to settle and adjust their accounts.

In the consideration of the questions submitted to me for my determination I shall follow the order in which the same are presented by the counsel for the contestant, Allison M. Archer, who alone interposes objections. His first claim is that the accounting executors should be charged for the half earnings of a barge known as the M. A. Archer for a portion of the year 1885 and the whole of the year 1886. This was a vessel constructed in the year 1883 for the freighting of bricks from an estate brickyard. The arrangement under which this vessel was to be constructed and paid for seems to have been made

through one T. W. Johnson, whereby the Archer estate was to become half owner and Johnson the other half owner, and the barge was to be provided with freight from the Archer brick-yard. The Archers were to pay in part, and the remaining portion, one-half its cost, was to come from the earnings of the vessel. The barge cost $5,173.16. The Archer estate paid to the builders $1,000, and to Johnson $329.22, on account of their half of such cost, leaving a balance of $1,257.36 to be paid by the earnings of the vessel. It appears from the testimony that about July 5, 1884, the gross earnings of the barge had reached $5,717.27, which, after deducting the running expenses of $2,633.10, left a net result of $3,084.17, to one-half of which the estate was entitled to credit in reimbursing Johnson. Evidently the whole of one-half of these earnings was not applied towards the payment of the balance due for the purchase price. Some other application of a portion of them must have been made, for it appears without contradiction that about January 6, 1885, Johnson and the executors had a settlement of the barge matters, and there then appeared to be a balance still owing on the Archer half of the barge of $149.02. It seems to be conceded that for the years 1885 and 1886 following this settlement and the fixing of such balance, Johnson, as the master and part owner of this vessel, continued to operate the same as theretofore, receiving the freights and paying the expenses thereof. While for the preceding years the contestant, as an executor, kept the accounts of the barge, thereafter, for some reason undisclosed, he ceased doing so, and consequently the estate has no account of the earnings of the barge for either of the years 1885 or 1886. Johnson seems to have kept the only accounts, and to have received all the earnings. It is pretty clearly shown that in the early part of the season of 1885 the earnings of the vessel were sufficient to pay Johnson in full for the balance found due him in January preceding. The contestant testifies that he received no part of the barge earnings for either of those years, and the accounting executors deny that

they ever received the same.    They concede the receipt of two
payments of $50 and $160, respectively, arising out of some
damage to the barge, and that thereafter there were earnings due
the estate, but deny that they ever received any part of the same.
Charles says that either his brother Allison or Johnson had these
earnings.    Allison denies the receipt of them, and thus from
the testimony Johnson appears to be the one who has received
and retained them.    Johnson absconded some years since, and
thus we have no testimony from him disclosing whether or not
he ever paid the same over to either executor.    The amount of
these earnings thus left unaccounted for by any one is consider-
able.    It seems from the evidence that for the balance of the
year 1885 the one-half earnings of the barge approximated
$600, and for the year 1886 the approximate sum of $800;
thus making an amount of some $1,400 unaccounted for by
either executors.    Without some proof that the same were re-
ceived by the accounting executors, or were lost to the estate be-
cause of their negligence in the administration of the estate
they should not be charged with these earnings, upon the con-
tention of this contestant.    He was also an executor during
these years, and also during 1887, and if these earnings were
lost to the estate he was at fault also, because of his failure to
collect the same.    It was as much his duty as that of his
brothers to give this matter his care and attention.    Indeed,
from the course of business between the executors in the man-
agement of the estate the barge matter had been one under the
special supervision of the contestant.    He is the only contest-
ant, and his claim comes with less force than if made by one
interested in the estate, but who had not participated in its ad-
ministration.    It seems that, as matter of law, he is precluded
from charging the other executors.    *In re* Niles, 113 N. Y.
547, 21 N. E. Rep. 687, and cases cited.

As to the balance of the earnings of the barge for the year
1888, of $420.37, the executors concede that the same is correct,
and that they should be charged therewith.    The counsel for

the contestant claims tha the item of credit of $31.50, "freight on wood," in schedule 1, No. 8, of the accounts, should be disallowed, on the ground that the proof shows it to be a part of the item of $122.19, in the same schedule, "A. M. Archer, Agt." The testimony of the contestant, Allison M. Archer, is to the effect that but $90 of this latter sum was all that was actually paid; that the payment was by check, which was produced and put in evidence. He says that this $122.19 was for wood that he had furnished the estate, and that this $90 was paid to him, and the balance of $31.50 to the captain of the vessel that delivered the wood. Neither of the executors denies the truthfulness of this version of the transaction, and I therefore find that the credit of the $122.19 is erroneous, and the same should be disallowed, except to the amount of $90, unless vouchers are produced for both of the payments claimed. The evidence shows, and the executors' counsel substantially concedes, that certain items of credits in the accounts should be corrected by reducing the same as follows: Bill of James Osborne, $10.42; bill of Daniel D. Williams, $2.60; bill of Edward J. Peck, $12.69; Glassing bill, $1.50; Blauvelt bill, $10.04; also an error of $5.50 in the item of $43.50 for roller, and $4 paid to Dr. Owen. In regard to the payment to William Decker of $73.46, his testimony shows that but $3 of this bill was for work done for the estate, and that the rest was for services at the homestead, for which the contestant was not bound to contribute. This, then, should be corrected so that the executors receive credit on this accounting for the $3 only. The contestant's counsel objects to the allowance of any credits for expenditures upon the homestead dwelling and other buildings appertaining thereto. The particular items objected to are the bills of George Redner, Gordon & Dutcher, Lewis W. King, all for painting; Springsteen & Gourley, $8.80, carpentering; C. T. Reynolds, for paints; and also all taxes levied upon and paid for the homestead property. He bases his objection upon the ground that the widow and the two sons, Charles and George, are, under

the will, given an interest or estate in such homestead analogous to a life estate, and that they are personally, as such tenants, obligated in law to pay for all such repairs and to discharge such taxes. If such is the interest or estate given, it would seem that the objection is well taken, but I do not construe the provisions of the will as devising such an estate. The testator devises and bequeaths all of his property, real and personal, to his executors, "in trust to receive the rents, issues and profits thereof for and during the lifetime of my widow, Clarissa A. Archer, and apply the same to the use of the following persons, as follows: Pay one-third thereof to my said wife during her lifetime, and the other two-thirds thereof to my three sons, Allison M. Archer, Charles D. Archer, and George Archer, in equal proportion during the same time." The testator then makes this further provision:

"Should my sons Charles and George and my said wife desire to continue to reside in my dwelling house where I now reside, then my will is that they may occupy my said dwelling house, and the lot and barn used therewith, and the furniture and property in the house and barn, so long as they desire so to do, without paying rent therefor during the lifetime of my said wife, each paying one-third of the actual living expenses of the household." "Should my son Allison desire to reside where he now does, my will is that he may do so without paying any rent during the lifetime of my said wife." "Should my three sons and my wife desire my son Allison and his family to reside with them where I now reside, then my will is that he may do so, so long as they desire." "The provisions herein made for my said wife are in lieu of her right of dower in my property."

Thus it appears that the estate is devised in trust to the executors, including the homestead dwelling, lot, and barn, and in them was lodged the legal title, with the duty of maintaining and protecting the same during the continuance of the trust, during the widow's lifetime (Stevenson v. Lesley, 70 N. Y. 512; Crooke v. County of Kings, 97 N. Y. 421); and it was their

duty to not only receive such rents, income and profits, but out of the same to pay and discharge all taxes, insurance and repairs, and pay over the balance in accordance with the directions of the will. *In re* Brewer, 43 Hun, 597; Young v. Brush, 28 N. Y. 667. A trustee may, at the expense of the estate, cause necessary repairs to be made to the buildings. *In re* Odell's Estate (Surr.), 4 N. Y. Supp. 463; *In re* Jones, 37 Hun, 430. Here the entire estate is given in one general trust, and the entire estate must therefore discharge such liabilities. I do not see that any discrimination can be made either in favor of or against any party for expenses incurred as to any particular part or portion of the estate. The testator clearly intended to merge the whole income of the estate, and to have the same distributed or paid over as directed, after deducting therefrom all proper expenditures in maintaining and preserving the trust properties and the expenses of administering the trust. The right to occupy the dwelling and homestead property given to the widow and two sons was not intended to divest the title and supervision of the executors of that portion of the estate, nor to relieve them from the care and protection of the same. The testator relieves the widow and sons from paying rent, and only imposes upon them the payment of the "actual living expenses of the household." If it was his purpose to have them pay or to be charged with the further expenses of repairs and taxes, it would seem that he would so have expressed his wishes. He therefore left that property, as well as all other, including also the premises where the contestant then resided, and a right of occupancy of which was given to him free of rental, also, during the lifetime of the widow, under the charge of the executors. It therefore appears that these items of payments for repairs and taxes were properly chargeable to the estate generally, and the credits in their accounts should stand. Hancox v. Meeker, 95 N. Y. 528.

The item of $90.50, as paid to Jones & Furman, is not properly a credit, as the testimony stands. It was for coal sold to that firm, and for which they owe the estate. To entitle the

executors to such credit it should be shown to be uncollectible without their fault, or that actual credit had been given in the nature of a payment or set-off on an account or claim against the estate. This latter is what it is claimed to be done upon a settlement or adjustment with Jones & Furman, but until that is done the credit cannot stand. Charles Archer's testimony shows that no actual credit or payment had been allowed by Jones & Furman.

The item of $15.70 to C. C. Cooper for hay is not established. Allison Archer testifies that the hay was for the private or individual purposes at the homestead, and Charles has no recollection about it. I find no voucher, and the burden is upon the executors to establish the credit. To establish such an expenditure, the same must, where there is no voucher, "be supported" by the "uncontradicted oath of the accounting party, stating positively the fact of payment," etc. Code Civil Pro. section 2734.

Objection is made to the credit of the sum of $361.26, which forms a part of the item of $638.92, in a charge against the contestant in schedule K, under date of May, 1885. As to this credit, Charles Archer, in his testimony, says that this charge of $638.92 against the contestant is made up of two items— $277.66 and $361.26—as shown by the personal account book at the top of pages 100 and 101. This book contains the following entry at the top of page 100: "Dif. in wood account, 1883 & 84 overdrawn" $361.26. On page 101: "Dif. in brick and wood acc't, $277.66." The contestant testifies that this $361.26 was for money he loaned "them" (meaning the other executors), and that they paid him back; and he says they never charged that to him until he was set aside as executor. He said this latter statement could be proved by a Mr. Markham, but that was not done. George Archer was asked to explain this item, and, as I understand his testimony, this balance of $361.26 arose out of wood and brick transactions between the contestant and the estate, upon an adjustment of which there remained a balance due from him to the estate, and which was

entered as a charge against him in his individual account. I do not understand that the accounting executors ask any credit for paying that sum. It is simply a question of whether or not the charge shall stand as an item against the contestant. This testimony of George, and his explanation of the matter is not denied by the contestant, except by his testimony that I have cited. It seems to me that at this late day, upon this evidence, the contestant cannot avoid this charge against him. It seems strange, if it were a loan, that such odd figures would have appeared. Again, if it were to repay a loan, there should be something to appear in written form to sustain that claim. At that time the contestant was an acting executor, and during the years following it seems that he would have had some entry thereof made upon the books to show that this was a loan, especially where it does not appear that he had a writing to show it to be a loan. I think the charge should stand.

The contestant claims that either the item of $175 of "Schedule I, No. 8," "September 29, 1881, schooner G. Harrington (cargo of wood)," or "$176, September 30th, Capt. schooner General Harrington, balance on cargo wood," should be disallowed, on the ground that the items relate to one transaction, and that but one payment was made. Charles Archer testifies that in a former proceeding the contestant testified that he made payments for two loads of wood at the same time, and to the same person; that these payments were actually made; that Capt. Ward was the captain of the General Harrington, and that he was also financial agent for the Lawrence. Charles further testifies that these two payments were actually made to that captain; that both boats came along at the same time; and that they were settled for at the same time. It will be observed that these entries were made in the books in 1881; that the contestant was then, and for several years thereafter, an executor, and actively participating in the administration of the estate, and that no objection was ever made to the same, although settlements or examinations of the accounts were had. Under the circumstances, I am of the judgment that these credits should

stand.   Indeed, if he was then an executor, it seems to me that he is attacking credits which he himself might be called upon to substantiate.

I do not think that the objections should prevail as to the payments to the Brick Manufacturers' Association.   These payments seem to have been made through or by reason of some arrangement of the brick manufacturers for their benefit and the trade.   I am not prepared to say that the payments were not legitimate, under the circumstances.

An objection is made to the allowance of the payment of the item of $250 to Calvin Frost, as counsel fee, for services rendered and advice given the executors.   The only entry as to the same appearing in the accounts filed is, "Calvin Frost, attorney, $250."   Nothing there appears as to the services of counsel for which the payment is claimed to have been made.   The only testimony as to this item appears to have been given by the executor Charles D. Archer.   He identifies a receipt for the payment of this sum to Mr. Frost, and says that payment was for an opinion; that subsequently a proceeding was brought against his brother, who is this contestant, to remove him as executor, and that Mr. Frost was consulted all the way through that proceeding.   This is, in substance, all of his testimony as to what the payment was for.   The opinion is not before me. I do not consider the proof sufficient to call for the allowance of this item.   So far as that proceeding is to be considered, the executors were fully represented by other able and competent counsel, who was fully paid, and the executors are credited and allowed for all such expenditures.   To entitle them to incur an expense chargeable to the estate for further counsel, some proof should have been adduced showing the circumstances which made that necessary for the proper administration and protection of the estate.   Nothing of that kind appears.   The burden of proof was upon the executors to establish this charge. The mere fact of payment by an executor or administrator of a sum of money is not sufficient to cast the burden of impeaching its justice upon the objector.   Estate of Nocken, 15 N. Y.

St. Rep. 731; Estate of Harnett, id. 725.  Items of an account of executors or administrators for professional services and otherwise, in the absence of proof that such services were necessary for the protection or administration of the estate, and that the sum charged is reasonable in amount, should be disallowed.  *In re* Casey's Estate (Sup.), 6 N. Y. Supp. 608; *In re* Collyer's Estate (Surr.), 9 N. Y. Supp. 297; St. John v. McKee, 2 Dem. Sur. 236; Willson v. Willson, id. 462; *In re* Rowland, 5 Dem. Sur. 216.  Nor is the production of a voucher, simply showing such payment, sufficient where objection is interposed.  Estate of Nocken, *supra;* Estate of Harnett, *supra.* There seems to be some conflict among the authorities touching the question of the burden of proof where a voucher is produced for the payment, but I am of the judgment that as to the expenses of the administration of an estate the burden is upon the accounting party to show the necessity of the expenditure and the reasonableness of the charge.  In Valentine v. Valentine, 3 Dem. Sur. 597, the learned surrogate seems to hold the contrary.  He cites as an authority sustaining his conclusion, *In re* Frazer, 92 N. Y. 239.  In that case the item under consideration was a credit for the payment of a debt of the deceased.  The claim, as the court there states (at page 247), "was based upon an alleged contract with the deceased, and presented and sworn to in the ordinary manner."  There is reason for the application of such a rule in that case.  The statute points out the method of authenticating debts or demands against a deceased person's estate, and, when thus authenticated and presented, the inference is that the same is proper and just; and the executor or administrator, when supplied with such a voucher, may rely upon the same to entitle him to an allowance thereof in his accounts, unless some objector presents proof to overcome this inference or presumption.  And as to debts or demands of the testator or intestate the personal representative is not supposed to possess any personal knowledge, and it is but just that he should, in the first instance, be entitled to rely upon the compliance with the statute as sufficient to protect him until

contrary proof be submitted. As to the expenses of adminis-
tration, the personal representative who incurs them is supposed
to have full knowledge thereof, while the persons interested in
the estate are most probably uninformed as to the same, and,
if objection is interposed as to the allowance of any such ex-
penditures, I see no hardship in requiring proof from the ac-
counting party of the necessity and reasonableness of the ex-
penditure. The distinction above indicated was recognized in
Journault v. Ferris, 2 Dem. Sur. 320. In *Re* White, 6 Dem.
Sur. 375, it was held that where an executor filed a voucher for
the payment made by him for services of counsel, from which
it appeared that the expense incurred was necessary, just and
reasonable, the burden of impeaching such payment was cast
upon the contesting party. I am not prepared to say that in
no case can such facts be embodied in the voucher, and form
legitimate proof against a contestant as to the necessity and
reasonableness of the expenditure, but it is sufficient to say
that does not appear in this case. This item, upon the proof, is
therefore disallowed.

The testator, as we have stated above, made this provision in
his will: "Should my son Allison desire to reside where he now
does, my will is that he may do so without paying any rent, dur-
ing the lifetime of my said wife." This son, the contestant,
then resided in a dwelling which constituted a part of the estate
of the testator. He continued to reside there until April 1,
1882. He then removed therefrom; from what appears, volun-
tarily. There is no proof that he has ever been excluded from
the occupancy of this dwelling, and yet he contends on this ac-
counting that he should receive the rentals from the executors
which they have collected from tenants who have since his
removal occupied the same. This claim is without foundation.
The executors were entitled to receive all income from the estate;
and when the contestant abandoned these premises he surren-
dered all control over the dwelling apartments, and it devolved
upon the executors to assume possession and control of the
same, and to obtain an income therefrom as a part of the estate.

The contestant's interest was simply a right of occupancy as a home for himself and family. As soon as he abandoned or surrendered this right by removing therefrom, he gave up all benefit to be derived from the same, given him under the will. The rentals received by the executors for this dwelling therefore constituted a part of the estate, and is distributable with the other income in accordance with the directions of the will.

We come now to the consideration of the remaining matter submitted by the contestant's counsel. About February 1, 1887, the one-half interest of T. W. Johnson in the above-mentioned barge M. A. Archer—the estate owning the other half—was purchased of Johnson for the consideration of $2,300, and the bill of sale thereof taken in the individual name of the executor, George Archer. The contestant claims that this purchase was one for the estate, and that the property thereby acquired, and earnings thereof, should be accounted for as estate property and assets. George Archer claims that the purchase was an individual transaction, and that the estate has no interest therein, and that he is not accountable therefor as an executor. From a careful review and consideration of all the circumstances connected with the purchase of this half interest in this barge, and the relations of the parties, I have reached the conclusion that this purchase must be held to have been one in the interest of the estate, and which must be treated and considered as such on this accounting. This barge was first acquired in the belief that it would be a profitable investment as a part of the estate business. The earnings of the same for the years preceding the year 1887 had demonstrated that it was such from the profits realized therefrom. The earnings showed a large return to the owners of the vessel on the capital invested. The freighting was a usual and ordinary part of the brick manufacturing business, and a remunerative part thereof. In view of these facts, all of which were known to the executors, George Archer and Charles D. Archer, I do not believe that they, or either of them, should in equity be permitted to acquire this interest in the barge, as they have attempted to do, and shut out their

20

brother, the contestant, from participating in the purchase and sharing in the benefits of that undertaking. George claims that he made the purchase individually from Johnson. He received a bill of sale in his individual name, and gave his notes, he says, to Johnson for the purchase money, except that he paid $50 to bind the bargain. That is all the cash he claims to have paid. The evidence shows that whatever has since been paid came wholly from the earnings of the barge. Upon examination of the notes that have been submitted to me as exhibits, I find that but three were given by George to Johnson, and aggregating but $1,050. The bill of sales recites a consideration of $2,300. How was the balance secured or adjusted with Johnson? As a part of the writings relating to this sale and purchase there was put in evidence a receipt from Johnson for all "dues and demands whatsoever either against the estate of M. A. Archer, or against George, Allison, or Charles, individually or as executors, barring a note against Allison for $175." Does not this indicate that there was a "jumping" of matters between the estate, these executors, and Johnson? May not the unaccounted-for earnings of the barge for the years 1885 and 1886 have entered into this transaction? Charles Archer says the earnings of the barge were settled with Johnson early in the winter, and George says that a settlement was had with Johnson when he purchased the barge, and they went by Johnson's account. But, if this be not so, then it would seem that the balance of this $2,300 was in some way realized through the note of Charles and George to the order of Nickerson, under date of January 29, 1887, and thus Charles appears to be clearly connected with the purchase, and another circumstance is added, indicating that it was an estate matter. George says he purchased individually, yet Charles is uncertain whether he had an interest in the purchase or not. He testified at one time that he regarded himself as having an interest in the barge equally with George. He says he told George that the barge was going to be sold, and said "Let 'us' try and get it." He says he was present at the conversation with Sherwood, who

indorsed the notes to be given to Johnson, and that he told him "we" would like to get the barge. He says that he will not be sure that none of the earnings of the barge which went to pay the notes belonged to the estate. He says he saw Johnson, and went around to Sherwood; that he was present at the purchase, and took part in the discussion or negotiation, and said to Johnson, "We will take it," referring to the barge. He testifies "we" gave the Sherwood notes. Notes have been submitted as renewals of these Johnson notes. Some are those of George Archer individually; some of Nickerson, to the order C. D. & G. Archer, and indorsed by them; and some made by Charles D. Archer and George Archer to the order of Nickerson; one from Charles to Sherwood, and bearing date during the period from January 29, 1887, to April 4, 1889. Some are mutilated by removing George's name. These circumstances indicate that Charles was also a party interested in the purchase, and that Nickerson & Co., who were the sales commissioners' agents of the estate, were called upon to lend their assistance, by way of accommodation, or else these notes represented the proceeds of sales of bricks, or advances. Charles states that the estate had discounts through the Second National Bank, where George kept his account.

If Charles is a party to be benefited by this transaction, why not Allison? There is nothing really prejudicial to the contestant's claim in the fact that the bill of sale was taken in George's name. The accounts and other evidence show that with the approval of all parties other valuable properties, purchased in behalf of the estate, were taken in the name of George alone, and yet conceded to be a part of the estate, in the benefits from which all are to participate. Then why not, also, in this barge and its earnings? George does not claim to have put but $50 in the barge. Why should he absorb this profitable branch of the estate business to the exclusion of the others, made equal under the will of his father. The first half of the barge acquired by the estate was paid for by its earnings in two or three years. George knew this, and he ought not to be permitted to

acquire the second half to the detriment or loss of the estate, and paid for in the same manner. Charles, it seems, is interested in another barge, the Clara, furnished profitable freighting from the estate brickyards. It does not seem to me fair nor equitable that Allison should be shut out of his share of the benefits from this transaction. These executors occupy a fiduciary relation to the contestant in the administration of this estate, and they cannot equitably refuse to share not only all direct benefits, but also all incidental pecuniary advantages out of the same. If this be not so, then the trustee may, through his experience and observation in the management of trust property, learn of the incidental advantages and benefits that may accrue therefrom, and absorb and prosecute them to his individual profit. The law holding trustees to a faithful and honest administration of trust and fair and just dealing between persons associated together in fiduciary relations does not permit that. Equitable as well as legal rules are applicable. Upson v. Badeau, 3 Bradf. (Sur.) 13. A trustee cannot make any profit to himself from a secret transaction initiated while the relation of trustee and *cestui que trust* exists. Green v. Green, 2 Redf. (Sur.) 408; Gardner v. Ogden, 22 N. Y. 327; Mitchell v. Reed, 61 N. Y. 123. The principle of the rule of equity which prohibits purchases by parties placed in a situation of trust or confidence, that no such person can be permitted to purchase an interest in property, and hold it for his own benefit, where he has a duty to perform in relation to such property which is inconsistent with the character of a purchaser on his own account. Van Epps v. Van Epps, 9 Paige, 237; Hawley v. Cramer, 4 Cow. 717; Willink v. Vanderveer, 1 Barb. 599. This rule is recognized in Harrington v. Bank, 101 N. Y. 259-264, 4 N. E. Rep. 346. It is there stated to be a "well-established doctrine that a trustee cannot purchase or deal in the trust property in his own behalf, or for his own benefit, directly or indirectly. This is a rule of equity, and is not to be impaired or weakened." In Mitchell v. Reed, *supra*, Judge EARL, writing the opinion, says (at page 126), speaking of the relations of partners:

"The functions, rights, and duties of partners in a great measure comprehend both those of trustees and agents, and the general rules of law applicable to such characters are applicable to them. Neither partner can, in the business and affairs of the firm, clandestinely stipulate for a private advantage to himself. He can neither sell to nor buy from the firm at a concealed profit to himself. Every advantage of the firm must inure to the benefit of the firm. These principles are elementary, and are not contested."

My conclusion is that this purchase of the Johnson half of the barge must be decreed to be one in behalf of the estate, and the purchase price paid, and the earnings of such half accounted for, as an estate transaction. In the adjustment thereof George Archer may be reimbursed for the cash he may have paid individually, and I will allow on such adjustment the $186.50 paid by Charles and George Archer to Denton Fowler as the debt of Allison to Johnson evidenced by the $175 note. It seems to me that this note was paid in connection with the purchase of Johnson's interest in the barge. It appears to have been a payment made without Allison's authority, as half of the amount paid was at the time charged on the books to each Charles and George individually, and they took an assignment of the note and debt from Fowler upon making such payment, which shows a purchase of the note as a debt to be thereafter collected by them. Allison should allow this payment, however, in the adjustment of the barge transactions on the settlement of the decree herein in the adjustment of the equities. Let a decree be presented accordingly for settlement and entry; costs to each party to be paid out of the estate.