1. EXECUTORS AND ADMINISTRATORS—ACCOUNTING—COUNSEL FEES.
    The burden of showing that counsel fees paid by an executor were fair and reasonable, and that the services charged for were necessary and proper, is on the executor.

2. SAME—SERVICES OF COUNSEL.
    An executor will not be credited on his accounting with payments made to counsel to collect interest, to look after repairs of the property of the estate, and to procure and pay tax bills, as such services should be performed by the executor personally.

3. SAME—COMPENSATION—RENOUNCING PROVISIONS OF WILL.
    Under Code Civ. Proc. § 2730, providing that an executor may renounce the provision of the will that a certain compensation should be paid him in lieu of his statutory fees, an agreement by an executor to accept the provision of the will for his compensation does not estop him at any time afterwards to renounce it.

4. SAME—DISTRIBUTION OF ESTATE.
    The creditors to whom Code Civ. Proc. § 2743, provides that the estate of a decedent may be distributed, are the creditors of the decedent, and not the creditors of a legatee.

Judicial settlement of the accounts of Oliver M. Arkenburgh and another, as executors of the will of Robert H. Arkenburgh, deceased.

Robert F. Little and Frank Arnold, for the executor.

J. W. Feeter, for the executrix.

Charles E. Souther, John Larkin, and A. X. Fallon, for contestants.

TOMPKINS, S. Letters testamentary were issued to Eliza J. Arkenburgh and Oliver M. Arkenburgh on the estate of Robert H.

Arkenburgh on the 25th day of September, 1890. The executor and executrix made a joint petition to the surrogate of the county of Rockland on the 25th day of October, 1893, praying for a judicial settlement of the account of their proceedings. On the return of the citation an account was filed, which was signed and verified by the executor alone. Objections thereto were filed on the 27th day of February, 1894, by Robert H. Arkenburgh, Eliza J. Wiggins, Jeanette A. Knapp, children and legatees of the testator. Thereafter further and supplemental objections were filed by them, and by James Wiggins, trustee of Jeanette A. Knapp, and Edward B. Arkenburgh. After many hearings had been had on the issues raised by these objections, and on the 22d day of December, 1894, the executrix filed a separate account, to which objections were filed by the executor. The two accounts are substantially alike, except so far as the several objections affect them. The executrix, by her account, seeks to support and give force to the objections filed by the legatees, except as to the amounts paid for counsel fees, in which she participated. The objections filed present a number of questions, which I will take up and consider in the order in which they were presented by counsel for the contestants on the argument and final submission.

The executor seeks credit for the sum of $9,500, paid to Robert F. Little for counsel fees and legal services from September 24, 1890, to December, 1893. This item is objected to as unreasonable and excessive. The vouchers filed by the executor in support of the charge show all the items of the service rendered, and embrace all the legal services rendered to the executor during the period stated.

The testator left an estate of about $1,000,000, consisting of valuable real estate in New York City, and largely of consolidated gas stock and government and municipal bonds; and the services charged for by counsel consist largely of matters connected with the making of contracts for the sale and the sale of real estate. At the time of the testator's death there was no litigation pending against him except the McLoughlin suit, which was never revived or continued against the executors. There was no litigation in which the executors or the estate was involved during this whole period. The will was not complicated, nor were any of its provisions of doubtful meaning or construction. There was real estate in several other states, in each of which states the executor's counsel, Mr. Little, procured the will to be probated by local attorneys. The amount paid to Mr. Little for disbursements was $642.78, which is not included in the item of $9,500. The services of counsel, in brief, were as follows: Probate of the will in Rockland county, which was accomplished without the issuing of a citation and by consent of all the parties; the procuring of an order permitting the executors to advertise for claims; the appointment of appraisers; making of the appraisement and inventory, concerning which there was nothing unusual or extraordinary. There were 10 contracts prepared for the sale of 10 distinct parcels of real estate, and afterwards deeds were prepared, and the attorney attended upon the closing of the title. Those contracts were in the main the usual and ordinary contract. Hirsh, who contracted for 16 lots, refused to take title to 8 of them; and the executor's counsel

made a submission of the matter to the Lawyers' Title Insurance Company, which afterwards insured the title. The executor's counsel had previously examined the title for the testator when he purchased the property. The executor's counsel also procured an agreement from one Kirby, subjecting his property adjoining estate property to certain restrictions. He also secured the discharge of a mechanic's lien; corresponded with counsel in New Jersey in reference to assessments against estate property in the city of Rahway. He also rendered services in an effort to perfect the title of the estate to a small gore lot, which result was never accomplished; corresponded and consulted with the board of health in reference to a complaint which had been made regarding the Seventy-Fifth street lots. He attended to the payment of two or three mortgages, procured tax bills and paid them, looked after repairs to the real estate, and received interest due the estate. He also charges in this item for work done in preparing the account which the executor now asks to have settled, and in preparing and arranging the vouchers, etc. Many interviews with the executor and executrix are set forth in the vouchers, and the testimony of the attorney, his books and vouchers, very fully describe the exact character and extent of the services rendered by him, and the contracts, submissions, and agreements which he prepared have been put in evidence.

The burden of establishing the fairness and reasonableness of this charge for counsel fees is upon the executor, and the executor must show that the services charged for were necessary and proper. In re Archer's Estate (Surr.) 23 N. Y. Supp. 1041. Much of the service rendered by counsel is not the proper subject of charge against the estate. It was the executor's duty to collect interest, look after repairs, procure tax bills, and pay them. It does not appear that there was anything in these matters that called for or required the services of a lawyer. The fact that the executor was absent from the city, or that it was convenient for him to have his attorney do these things, does not justify a charge being made against the estate. He must pay his attorney personally for such services. For the services of counsel which the executor should be reimbursed for, a fair and reasonable compensation should be allowed. In determining the amount to be allowed, I consider as the first and most important element the work actually performed; second, the amount involved; third, the standing and reputation and learning of the lawyer; fourth, the result of the services. Here the work has been fully testified to, and, while the amounts involved were large, they were not involved in litigation, but were for the most part in real estate, which could not well be jeopardized, and the value of which did not depend upon legal skill or learning. The ability and integrity of the attorney are conceded, and, for such services as he rendered, he is entitled to as large compensation as any court should ever allow. For such services on the whole case, I am convinced that $6,000 is adequate and liberal compensation; in fact, from the testimony given by the witnesses called on both sides, it is difficult to justify a charge of that amount.

The executor called Payson Merrill and John M. Scribner as wit-

nesses in support of the charge. They testified generally on the direct examination, without giving any items, that the charge of $9,500 was reasonable. On cross-examination Mr. Merrill gives the following items: $250 to $500 for probate of the will; $25 to $50 for each contract and closing title. He did not separate the various items of the bills, but calculated about the number of days occupied by Mr. Little, and then estimated that his services were worth from $75 to $100 per day. Mr. Scribner says that $9,500 was a fair charge for all the work; that $1,000 would have been a reasonable amount as a retainer, and for all services on the probate of the will, including making the inventory and advertising for claims; $25 to $50 for real-estate contracts and closing title. He says that there was nothing in these contracts to justify extra charge; $1,000 for all the work in connection with the account, down to the engrossing of it, which he includes in the estimate of $9,500. He fixes the value of the argument and submission to the title insurance company at $1,500. After giving these items, he was asked how he made up the balance of the $9,500, and he stated: "I can't make up the balance." James K. Bishop and Edward R. De Grove testified on behalf of the contestants; Mr. Bishop stating that all the services, exclusive of the work on the account, were not reasonably worth more than $4,000, and that the account was worth from $1,000 to $1,500. In detailing the value of the different services, he says that the probating of the will was worth $250; the submission to the title insurance company, from $500 to $750; $10 to $25 for preparing each contract, and $25 for closing the title; $200 for the Farley contract, sale, and procuring Kirby agreement, and he allows $1,500 for general services, including interviews, receipt of letters, etc. De Grove fixes the value of all the services, including the preparation of the account, at $5,500 at the outside figure. He fixes the services on probate of the will at about $1,000. These witnesses are not so far apart when they give the items, but their totals widely differ. When the items of all the witnesses are taken, it will be found that the result comes very near the totals given by the contestants' witnesses.

Now, allowing as a retainer and for the probate of the will, including all services to the advertising for claims, the sum of $1,000, which is the highest figure put upon these services by the executor's witnesses, and the sum of $500 for the preparation and consummation of the 10 contracts, the sum of $400 for the submission to the title insurance company, $50 for the Kirby agreement, $300 for procuring probate of will in the three other states, $50 for Rahway tax matter, $50 for O'Hare lien, $150 for gore-lot services, $50 for board of health matter, $1,000 for services in reference to account; add to these amounts $2,000 for interviews, letters received, writing letters, and general advice, and services set forth in detail in the vouchers,— and we have a total of $5,650. The foregoing amounts are very liberal allowances, and are in excess of the average fixed by the expert testimony. Most of these payments were made by the executor and executrix together. It appears that all of the amounts paid to the counsel, except the sum of $1,768.22, were paid by both executor and executrix. In the payment of the last-named amount the

executrix did not unite.    They will be allowed the sum of $6,000 for counsel fees paid to Mr. Little, and the proportion of the difference to be borne by the executor and executrix will be fixed by me on the settlement of the decree.

The next question presented is in reference to commissions of the executor and executrix.

The will contained the following provision:

"I direct that the sum of one thousand dollars, and no more, shall be allowed to or received by each of those who shall qualify as executrix or executor hereunder, as and for their commissions; and said sum shall be in lieu of the commissions allowed by law."

The will was admitted to probate on the 25th day of September, 1890, at which time letters testamentary were granted.    On the 29th day of May, 1893, the executor filed in this court his renunciation of the specific compensation provided by the will; and in the month of December, 1893, the executrix filed a similar renunciation. Since then the executrix has filed a retraction of her renunciation, but during the contest it was stated by counsel for the executrix, or by the executrix, that she desired to withdraw her renunciation retraction, and that, if the executor received full commissions, she wanted the same.    Her former counsel was not explicit as to his client's position in reference to the question of commissions.

It is contended by the contestants that on the day the will was read, and before it was probated, the executor and executrix were both asked whether they were satisfied by the provision of the will for their compensation, and that they answered that they were; and it is claimed that they elected and agreed to accept the specific com pensation, and were thereafter estopped from renouncing it and claiming the statutory fees.    I think that this claim is not good. The Code gave them the right to renounce the specific compensation, and no time is fixed for that purpose.    Section 2730.    It has been held that it may be done at any time before the decree is made.    In re Weeks, 5 Dem. Sur. 194.    Action in reference to this matter was not essential to the probate of the will, or to entitle the executors to qualify.    They were under no obligations to the legatees in re- spect to the commissions.    The elements of an estoppel do not exist, and the executor is entitled to the commissions allowed by statute. Whether the executrix has successfully retracted her renunciation, and, if she has not, the proportion of the commissions to be awarded to the executor and executrix, I will determine upon the settlement of the decree.

The contestants claim that the executor was indebted to the tes- tator in his lifetime and at the time of his death in about the sum of $40,000.    The executor charges himself in his account with the sum of $3,000, which appears on the books of the testator against him, and which he admits is a proper charge against him.    By sub- division 15 of Schedule J of the account, the executor explains that charges aggregating $5,983.42, appearing on the books of the testator against him, from the date of the will, to wit, February 26, 1889, down to the testator's death, were paid to him for services rendered to the testator, and were paid to him by testator, and that he is not

indebted to the estate for the same. The contestants, on the other hand, claim that the executor, during that period, and during several years prior thereto, took from his father large sums of money, including the above amount of $5,983.42, in excess of the amounts to which he was entitled for services, and with which he should now be charged. The burden of establishing this claim rests upon the contestants. It is claimed that the executor was only entitled to receive $1,800 per year down to the date of the testator's death. The books of the testator, kept in the main by the executor, have been put in evidence, from which it appears that sums largely in excess of that amount were received by the executor, and not returned; and testimony has been given of statements made by the executor to the effect that he would not pay any amount to the estate or charge himself with any indebtedness until it was proven, and the testimony of the executrix is given to the effect that in 1890, and a short time before the testator's death, she saw a paper in his possession called an "inventory," such as the executor was in the habit of making out for the testator, made out by the executor, which showed, among other things, that Oliver M. Arkenburgh, the executor, was indebted to his father in the sum of about $15,000. This is all denied by the executor. The testator was a large dealer in the tobacco business. He had interests in Kentucky, where the tobacco was grown and purchased by him, and he had an office in New York City. He owned many valuable pieces of real estate in New York City, and was the holder of considerable stocks and securities. In 1867, when Oliver, the executor, left college, he entered his father's New York office, and remained there until about the year 1877, when he left. He testifies that in 1878 his father called upon him at his boarding house, and said that he wished him to come back with him immediately, and said that he would allow him a sum sufficient for his maintenance according to the way in which he was brought up. No amount was stipulated between them. Oliver went then to his father's office, and continued in his employ down to the testator's death, acting as his bookkeeper, confidential clerk, and manager, and devoting all of his time to his father's service; and he claims that all the moneys shown by the books to have been received by him were under the agreement made in 1878, by which he was to be supported in the manner in which he was brought up.

After a careful examination of all the testimony and the exhaustive briefs of counsel, I have concluded that the contestants have failed to establish the alleged indebtedness.

The claim of the executor that such a contract was made by his father, and that he was not limited to $1,800, is corroborated by the fact that on several occasions, in several places in the books, amounts are credited to him for services in excess of $1,800; and on June 20, 1888, the testator made and signed the following memorandum:

"Whereas, Oliver M. Arkenburgh has rendered certain services to me in keeping my accounts and looking after my affairs generally, including my estate, during the years 1882, 1883, 1884, 1885, and 1886, it is hereby mutually agreed that he shall be allowed and take credit in account for the sum of $7,789.74 for the years mentioned, which sum shall be in full settlement and

discharge for any and all claims he may have for services rendered in my behalf during said years above mentioned, which amount has already been paid to him, having been drawn from time to time during the aforesaid years."

This clearly indicates the desire and intention of the testator to allow the executor for his services the amount which the books at that time showed him to have received, which was largely in excess of $1,800 a year.

It must be presumed that the testator knew the contents, or the substance of the contents, of the books. They were always accessible to him. Several times each year during all of that time he had received statements or inventories from his son containing, in brief, the state of the various accounts; and there is no proof that during all of those years any complaint was made by the testator concerning the manner in which they were kept, nor were any inaccuracies ever charged. A power of attorney was given by the testator to the executor, which was revoked at the request of the executor April 1, 1889; and he testifies that he accounted to his father for all moneys received by virtue of that power of attorney, and there are not sufficient circumstances to overcome that testimony. That the testator knew the condition of his books generally, and the character and effect of the various entries therein against his sons, is evidenced by the release which he made on the 10th day of December, 1888, by which he released his sons, Robert, Oliver, and William, from all and every claim and liability to him by reason of the tobacco business carried on under the firm name of "O. M. Arkenburgh & Co." and the name of "O. M. Arkenburgh," and from all liability by reason of entries in his books growing out of these transactions; and those entries and the particular character of the several entries are fully set forth in the release, showing the testator's familiarity with the books. He was concededly a shrewd and careful business man, at his office almost every day, and in almost constant contact with his business affairs and financial matters; and it does not seem reasonable that covering a period of 10 or 12 years he should have been so deceived by Oliver, and blind to the fact that upward of $40,000 was being taken from him unlawfully. It is clear that he knew during these years that Oliver was receiving much more than $1,800 per year, and that in 1888 he expressly sanctioned it by personally crediting him with the sum of $7,789.74, which had not been previously directly credited to him; and it must be assumed that this amount included all the sums with which Oliver was then chargeable. I find from the books in evidence that, from 1878 to the death of testator, Oliver received about the sum of $69,000, making an average of about $5,400 per year, and that the same was received pursuant to the agreement of 1878, and was so understood and agreed by the testator.

Another fact which very strongly corroborates the executor's claim is the provisions of the will in reference to advances. The will was made on the 26th day of February, 1889, and after the testator had knowledge of the fact that his son Oliver had retained some, at least, of these large amounts of money. The will is a very carefully drawn document, and must have been the result of much

careful thought, after a thorough examination of his books and a full knowledge of the condition of his affairs.

After dividing the estate, the will provides as follows:

"Provided always, and I hereby declare, that, if I shall in my lifetime advance or give to any of my children any sum or sums of money for his or her advancement or benefit, then every such sum shall be taken in or towards satisfaction of the provision intended to be hereby made for such child, and shall be accounted for accordingly; and I hereby further declare that the only advancements which have been made to any of my children up to and at the date of this, my will, are such as have been made to my son Robert H. Arkenburgh, as follows: On the first day of January, 1885, my said son Robert had received from me the sum of twenty-four thousand dollars," etc.

The will proceeds to specify other amounts had by the testator's son Robert, and charges all the amounts against him. By this provision the testator shows his familiarity with the state of the account with Robert, and incidentally with the contents of the books, at least so far as Robert was concerned. Here is a positive and express declaration that Oliver was not at that time indebted to him, and that no advance had been made or moneys received by him which could be construed into an indebtedness. This positive statement that no indebtedness existed can only be overcome by clear and convincing evidence that the testator had been deceived by Oliver, and was ignorant of the condition of his account and of his acts and conduct. Such convincing proof is not given. After the date of the will, it does not appear that any advances were made to Oliver. At least there is no proof of the receipt of any moneys by him after that date, except various sums appropriated for living expenses as before, and the sum of $3,000, which was placed in his hands for a specific purpose, and never used, and for which he now accounts. Nor do the books show any charge against him of an advancement.

The executor seeks to charge Robert H. Arkenburgh with the items contained in Schedule B, aggregating $2,494, which he seeks to have deducted from Robert's share of the profit of tobacco accounts Nos. 10 and 11. The first twelve of these items, excepting one item of $25 (November 22, 1889), are objected to. It is sought to make out these charges by an account stated between them. The executor testifies that in October, 1890, he handed to Robert a pencil memorandum containing these charges against him, and showing a balance in Robert's favor of $223.91, and that Robert put it in his pocket, but said nothing. Robert denies that he ever received the statement. The executor has failed to make out an account stated between them. From the testimony, however, I find that the following items should be charged against him: $64.25, money advanced by testator to pay premium on life insurance while Robert was in Kentucky; $25, paid to Dr. Davis; $22.50, insurance on furniture in Robert's Kentucky house. The items for taxes and insurance on the Kentucky house are not allowed as charges against Robert, for the reason that the premises were then owned by the testator; and, while it is true that the conveyance was probably made to protect it from Robert's creditors, nevertheless the title was in the father, and remained in him until his death, and Robert

testified that he deeded it to his father to secure him against certain losses. The father devised that particular property to Robert by his will, but that fact, even if his intention to do so was known by Robert, would not cast upon the prospective devisee the duty of paying taxes in anticipation of the devise and death. As to the other items of that account against Robert, to wit, $225, $579.80, and $100, I am not clear, and will hear counsel further in respect thereto upon settlement of the decree.

The claim of Robert to the sum of $677.71 for services in selling tobacco for the executor is disputed by the executor, and is not such a claim as can be determined upon this accounting. It must be enforced by an action. It is not a part of the joint tobacco account between the testator and his three sons, but is an independent claim against the executor for services rendered the estate.

In an action between Oliver M. Arkenburgh and Robert H. Arkenburgh a warrant of attachment was issued to the sheriff of the city and county of New York against the interest of Robert H. Arkenburgh in this estate. The warrant was put in evidence and it is now claimed by the executor that the decree herein should recognize the lien of the said attachment, and provide for the payment over to the sheriff of whatever sum may be found to be due Robert. The surrogate has no power to determine the validity of the attachment. In fact, there is no proof before me that the attachment is still in force. The sheriff is not a creditor of the deceased, nor a legatee, nor does he stand in the position of an assignee of a creditor or legatee, within the provisions of Code, § 2743. The case of In re Gilligan's Estate (Surr.) 3 N. Y. Supp. 17, cited by counsel for the executor, is not applicable. There the intervening party was a receiver in supplementary proceedings, and represented and stood in the place of a judgment creditor whose claim was not disputed. An attachment simply secures and holds the property until the plaintiff can establish his claim. The surrogate only has such power as is conferred by statute or necessarily implied from the powers so conferred. In re Underhill, 117 N. Y. 471, 22 N. E. 1120. Section 2743 of the Code alone confers the jurisdiction and power of the surrogate in the making of the decree. That section only authorizes a distribution to the creditors, legatees, next of kin, husband, or wife, or their assigns. The word "creditors" means creditors of the deceased. In re Redfield's Estate (Sup.) 25 N. Y. Supp. 4. And nowhere is the surrogate given power to distribute to any other person. The sheriff is not either a legatee, assignee of a legatee, or creditor of the deceased.

Costs to all parties out of the estate, to be fixed on settlement of the decree.

Ordered accordingly.